**ROBERT HALF INTERNATIONAL, INC., Plaintiff,**

v.

**William C. VAN STEENIS, Defendant.**

**Civ. A. No. 91–CV–71957–DT.**

United States District Court, E.D. Michigan, S.D.

Dec. 12, 1991.

Dennis Bonucchi, Detroit, Mich., for plaintiff.

David W. Zoll, Toledo, Ohio, for defendant.

## SECOND AMENDED FINAL OPINION AND ORDER GRANTING PERMANENT INJUNCTIVE RELIEF

ROSEN, District Judge.

The Plaintiff, Robert Half International, Inc., filed this case on April 29, 1991 seeking to enjoin its former employee, Defendant William Van Steenis, from violating the terms of a restrictive covenant and noncompetition clause in his employment contract with the Plaintiff. The Court initially scheduled this matter for hearing on the Plaintiff's motion for preliminary injunctive relief on Friday, May 10, 1991. At that hearing, the Plaintiff stated, through coun-

sel, that it would seek only injunctive relief against Van Steenis. Consequently, with the consent of counsel for both parties, the Court ordered the trial of this case on the merits consolidated with the evidentiary hearing on the Plaintiff's motion for a preliminary injunction, pursuant to Fed. R.Civ.P. 65(a)(2).

The bench trial commenced on Monday, May 13, 1991 and concluded on Wednesday, May 15, 1991. Following the trial, Defendant, on June 3, 1991, brought a Motion to Dismiss for Lack of Subject Matter Jurisdiction alleging that Plaintiff's case did not meet the requisite $50,000 amount in controversy requirement for diversity jurisdiction under 28 U.S.C. § 1332. This was the first time the Defendant raised this issue. Plaintiff filed a response to this motion on June 17, 1991.

This Final Opinion and Order addresses Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction and constitutes the Court's findings of fact and conclusions of law resulting from the trial.

## DEFENDANT'S MOTION TO DISMISS

 As a preliminary matter, this Court will address Van Steenis' Motion to Dismiss. A challenge to subject-matter jurisdiction may be made at any time, even after a trial on the merits. Fed.R.Civ.P. 12(h)(3). The burden rests on the party seeking federal jurisdiction to show that it is properly in federal court. This showing must be supported by a preponderance of the evidence. *McNutt v. General Motors Acceptance Corporation*, 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936).

Assessing actual damages in actions in equity is made difficult by the very nature of the action. Yet this has not stopped courts from determining jurisdictional amounts in such instances:

> This action was brought in equity, which by its very nature presupposes the difficulty of ascertaining actual damages. The value to the plaintiff of the rights he is seeking to protect is the measure of jurisdiction in equity cases, even though the value of that right may not be capable of exact valuation in money.

*Premier Industrial Corp. v. Texas Industrial Fastener Co.*, 450 F.2d 444, 446 (5th Cir.1971).

In the action to enforce a covenant not to compete before it, the *Premier* court listed three possible approaches to valuation. First, the value of the damage suit which the plaintiff dropped against the defendant in consideration for a settlement agreement. Second, the value of the plaintiff's lost revenue because of the employment of the defendant by a competitor. Third, the value of the future effect of the defendant's breach upon all contracts with other agents of the plaintiff. *Id.* at 447.

To dispose of this motion, this Court need only rely on the second of the three *Premier* tests. Thus, to defend against Defendant's Motion to Dismiss, Plaintiff need prove by a preponderance of the evidence that the value of its lost revenue because of the employment of Defendant by a competitor exceeds $50,000 exclusive of interest and costs.

In its response to Van Steenis' motion, Plaintiff refers this Court to the affidavit and trial testimony of Mr. Frederick K. Getz, Area Manager in the States of Michigan and Ohio for Robert Half International, Inc. Mr. Getz stated in his affidavit that in the almost seven month period from July 1, 1990 to January 31, 1991, Van Steenis was solely responsible for generating business for Robert Half which resulted in revenues in the amount of $135,920. These revenues represent fees paid by various customers of Robert Half. According to Mr. Getz, Van Steenis has contacted these customers in his new position as an employee of a competing firm.

Mr. Getz testified at trial that Van Steenis' total compensation was equal to 33% of total billings or $35,000, whichever was greater. Mr. Getz said that Van Steenis was paid $53,000 in 1989 and $73,000 for the period beginning January 1, 1990 and ending February 5, 1991.

Van Steenis admitted that he was paid $53,124.92 in 1989, $61,015.10 in 1990, and that he received a check for $15,000 several days before he terminated his employment on February 5, 1991. As he was paid 33%

of his total billings for the year, the total client billings or revenues generated by Van Steenis in 1990 was $183,045.00.

In support of its motion, Van Steenis makes the conclusory statement that the Plaintiff has failed to present any evidence to suggest that Van Steenis' employment with his new employer results in at least $50,000 damages to the Plaintiff. Van Steenis goes on to state that, "In fact the evidence presented in this case tends to suggest to a legal certainty that the Plaintiff will not be damaged to this extent." Yet at no point in Van Steenis' two page motion does it present evidence to support this claim.

This Court finds that the Plaintiff has met its burden by showing by a preponderance of the evidence that the amount in controversy exceeds $50,000 exclusive of interest and costs. Particularly persuasive is testimony that Van Steenis generated a total of $183,045.00 in revenues for Plaintiff during 1990. It seems very likely that Van Steenis would generate a similar sum while working for the direct competitor of the Plaintiff for the year of the restrictive covenant. Had Van Steenis respected the restrictive covenant, this sum may well have been directed towards Plaintiff and not the competing concern.

## PLAINTIFF'S DEMAND FOR INJUNCTIVE RELIEF

### A. Findings of Fact

The Plaintiff, Robert Half International, Inc., is an employee recruitment firm concentrating in locating permanent and temporary employees in the areas of accounting and finance. Defendant William Van Steenis worked for the Plaintiff as a professional recruiter from May 18, 1988 through February 5, 1991. In this position, Van Steenis would contact various clients of the Plaintiff, corporations and other firms with openings for permanent professional employees in the areas of accounting and finance, and request that the client allow the Plaintiff to find a suitable prospective employee to fill the open position. If the Plaintiff were able to locate a suitable candidate, the Plaintiff arranged for an interview between the candidate and the client, the prospective employer. In the event the client agreed to hire one of the candidates referred by the Plaintiff, the Plaintiff would be entitled to receive an agreed-upon commission from the client/employer.

Van Steenis began to work for the Plaintiff on May 18, 1988. Prior to that time, he received an oral offer of employment from the Plaintiff's president, Fred Getz. According to Van Steenis, Getz promised him that he would receive an annual salary of $35,000 plus commissions equal to 33% of the client billings generated by Van Steenis on the Plaintiff's behalf. According to Van Steenis, Getz represented that the 33% bonus would be paid in addition to the regular $35,000 salary.

However, Getz testified that he never represented the compensation package this way. Instead, he testified that the Plaintiff's policy was always that the salary was only the minimum annual compensation paid to the recruiters. Thus, Van Steenis' total compensation would equal 33% of total billings or $35,000, whichever was greater—but not both. Getz testified that he did not misrepresent these terms to Van Steenis. These terms were confirmed as the usual arrangement by witness Kyle Luke, who is presently employed by the Plaintiff as a recruiter. Luke emphasized in his testimony, on behalf of the Plaintiff, that the bonus arrangements were "discretionary."

In any event, Van Steenis signed the Employment Agreement on May 18, 1988, the day he started work for the Plaintiff, although after he had accepted the employment offer. (The Employment Agreement was introduced into evidence as Plaintiff's Exhibit 7.) The Employment Agreement contains the following express terms regarding compensation:

6. *Compensation.* As compensation for his or her services to Employer, Employee shall receive a monthly salary of $2,916.67 monthly. In Employer's sole discretion, such salary may be changed from time to time, without amendment to this Agreement. Notwithstanding the foregoing, Employee agrees that any

sums he or she receives as benefits from any disability policy, the premiums of which were paid by Employer, or any Worker's Compensation benefits paid shall constitute Employee's total salary for that period in which the benefits are paid, and Employer shall be relieved from paying Employee further salary for that period of disability even though the amount received is less than Employee's then monthly salary.

In the Employer's sole discretion, bonuses, deferred compensation plans, health insurance and other benefit plans may be instituted from time to time. Employee can have no expectations regarding such plans or their continuation. All of such plans may be instituted, amended, and discontinued at any time at Employer's sole discretion, without Employee's consent.

(Plaintiff's Exhibit 7, Par. 6, p. 3).

Van Steenis testified that he read the contract and signed it on May 18, 1988. He further testified that his post-secondary education in accounting and finance included specialized training in contracts, and that he would not sign a contract unless he understood and agreed with its terms. Consequently, the Court finds, as a factual matter, that Van Steenis understood and accepted the terms of the Employment Agreement when he signed it on May 18, 1991.

Approximately two months after he started work, Van Steenis learned that it was the Plaintiff's intention to treat his $35,000 salary as a draw against his total compensation equal to 33% of his total client billings—that his $35,000 salary would not be paid over and above the 33% bonus. Nevertheless, Van Steenis continued to work for the Plaintiff until February, 1991 without receiving any further agreement from the Plaintiff to conform his compensation to Getz' original employment offer.

In addition to Van Steenis, other employees of the Plaintiff testified that Getz had represented to them that salary would be paid in addition to, rather than advanced as part of, the percentage bonus. Among these were Joy Carroll, presently still employed by the Plaintiff as a recruiter, and Diane Kyostia, a former employee and recruiter of temporary employees. Kyostia nevertheless signed an employment agreement substantially similar to Van Steenis' Employment Agreement after she started work for the Plaintiff.

In a similar vein, former employee Joel Hechler testified that he was misadvised by Fred Getz, when he was offered a job, that the Plaintiff would make contributions equal to 12% of his earnings to a pension plan for his benefit. This later turned out not to be true.

Based upon this testimony, taken together, the Court finds that the Van Steenis was told by Getz that the 33% bonus would be paid in addition to the regular $35,000 salary. The Court further finds, however, that Van Steenis knew, at the time he signed the written Employment Agreement that the compensation terms stated in that agreement differed materially from those represented by Getz, and the Van Steenis knowingly accepted the modified terms when he signed the Employment Agreement.

Van Steenis testified at trial that, in addition to the bonus issue, he became a dissatisfied employee because the Plaintiff, in November, 1990, restructured its employee benefits plan in the respect that the employees were henceforth required to make part of the plan contributions out of their own earnings, whereas, previously, the Plaintiff had made the entire contributions. Plaintiff's management circulated another memo in December, 1990, announcing that it would henceforth reduce employees' bonuses to 25% of billings in order to devote more resources to employee benefits.

In addition, as his experience increased, Van Steenis was required to spend more and more time supervising more recently hired employees, thus taking away time within which he would otherwise have earned sales commissions. Even so, Fred Getz testified that Van Steenis was well compensated, especially in comparison to later hires.

The Court finds that the Plaintiff's unilateral decisions to reduce employee benefits and to increase Van Steenis' supervisory responsibilities over other employees is consistent with the terms of the written Employment Agreement which Van Steenis knowingly signed. Specifically, Paragraph 3 of the Employment Agreement, captioned "Duties," specifically provides, "Employee shall have such duties as shall be assigned from time to time by Employer." (Plaintiff's Exhibit 7, Par. 3, p. 2). Moreover, the Employment agreement specifically states that any premiums paid by the Plaintiff on account of any employee benefits shall be counted towards the employee's stated salary. (Plaintiff's Exhibit 7, Par. 6. p. 3). Further, Paragraph 6 of the Employment Agreement specifically authorizes the Plaintiff to reduce employee benefits without the employee's consent. (Plaintiff's Exhibit 7, Par. 6, p. 3).

Van Steenis testified that, on one occasion in September, 1990, Fred Getz removed his belt and threatened to punish Van Steenis for some unidentified error or misconduct. (The evidence never identified what exactly what wrong Van Steenis had committed.) Besides Van Steenis, fellow employees, Kyle Luke and Joe Hechler were present. As a result of this incident, Van Steenis was "embarrassed," but he never felt threatened with actual physical danger.

Getz explained this incident as his attempt to "dramatize" his, and his supervisor's, exasperation at the failure of Van Steenis and his trainees to follow "basic" procedures. He testified that he did not actually intend to use the belt as a weapon.

Van Steenis testified that, sometime during his employment with the Plaintiff, the telephone system was deliberately reworked so that management designees could secretly listen in on employees' private conversations. Van Steenis was not aware of any instance where this capability was actually used. It is not clear how or when Van Steenis learned about the telephones.

Van Steenis also testified that fellow-recruiter Bruce Swart told him at one time (apparently towards the conclusion of Van Steenis' career with the Plaintiff) that Getz had instructed him (Swart) to rifle through Van Steenis' desktop, desk drawers, and personal briefcase to uncover information about Van Steenis' client contacts. Getz further instructed Swart to use whatever he could find to make his own calls on Van Steenis' clients, in order that he might use Van Steenis' contacts to develop his own business for the Plaintiff. These instructions from Fred Getz to Swart were confirmed by Swart's own testimony.

Getz did not deny that he instructed Swart to review materials in and on Van Steenis' desk and to use the papers he found there to call on Van Steenis' clients. In his view, any client and any client contact developed by any employee of the Plaintiff was the Plaintiff's property, and the Plaintiff always enforced its policy that individual recruiters were required to share with one another the entire roster of the Plaintiff's clients. Because Van Steenis attempted to secrete his client information for his own uses (perchance to earn for himself some "discretionary" bonus), Getz felt justified in ordering Swart to attempt to appropriate valuable client information from Van Steenis. Getz did deny, however, that he ever instructed Swart to go through Van Steenis' briefcase. Taking into consideration the demeanor and credibility of the witnesses, the Court finds that Swart was not instructed to go through Van Steenis' briefcase. In reaching this conclusion, however, the Court does not discount the sincerity or truthfulness of Van Steenis' testimony, and the Court believes that Swart may have told Van Steenis that Getz had instructed Swart to search Van Steenis' briefcase. Nevertheless, it is undisputed that Getz instructed Swart to search Swart's desk to uncover the Plaintiff's proprietary information concerning customer contacts.

The Plaintiff's "administrative manager," Michelle Doran, testified that, as part of her job, she went through Van Steenis' desk in his presence, inventorying all the client information and other documents found there. These responsibilities enabled

Doran to know, in detail, what documents Van Steenis had in his desk before he quit in February, 1991, and what remained after he left. The Court credits Doran's testimony and concludes that Van Steenis took with him his "pink" copies of client interview slips when he left his employment with the Plaintiff and went to work for AIM Executive, Inc., one of the Plaintiff's competitors.

The Plaintiff operates three offices in Michigan: in Ann Arbor, Southfield, and Troy. Van Steenis worked in the Southfield office. The Ann Arbor office is an "Accountemps" office, and the business conducted out of that office consists solely of the placement of temporary workers. The Southfield office operates both as "Accountemps"—placing temporary workers—and as recruiters of permanent accounting and finance professional employees. The Court finds that the Ann Arbor and Southfield offices were properly licensed, at all relevant times, for the particular business operations that were conducted out of those offices, respectively.

However, Van Steenis argues that the Plaintiff operated a permanent recruitment and placement operation out of the Troy office without obtaining the proper license required by the State of Michigan pursuant to M.C.L. §§ 339.1001–339.1002. Although the Troy office was granted a license on December 12, 1990 (Defendant's Exhibit 5), the Plaintiff illegally operated a permanent employment agency out of the Troy office without a license prior to that time.

According to the testimony of Diane Kyostia, she operated a permanent employment agency out of the Troy office, even though neither she nor the Plaintiff were properly licensed to conduct this business. According to her, both she and another recruiter in the Troy office took the state-required exam to get their personal licenses, but they were not granted by the state until the Troy office was itself licensed in December, 1990. Furthermore, while she was operating out of the Troy office, she was involved in dealing with the state Department of Licensing and Regulation in attempting to get the license for the Troy office. Kyostia testified that Fred Getz told her to misrepresent to state officials that the Plaintiff was conducting only an "Accountemps" business out of the Troy office (which did not require a license).

However, according to witness Michelle Doran, the Plaintiff first applied for the license to the Troy office in April, 1989, and the state inexplicably delayed until December, 1991 in granting the license. In her view, the state was unreasonable in requiring the Plaintiff to staff the Troy office with licensed recruiters before it would license the office to conduct a permanent agency business; it made little sense for the Plaintiff to staff the Troy office with licensed recruiters when they would be unable to do their jobs because the office itself lacked the required license. This, evidently, is the Plaintiff's explanation as to why the operated a permanent employment agency out of the Troy office before it obtained the December, 1990 license. Incidently, the Plaintiff was not licensed to operate a permanent employment agency at the Troy office at the time the Plaintiff signed the Employment Agreement in 1988.

Much of the remaining testimony at trial was offered by the Defendant and attempted to establish that the Plaintiff itself actively encouraged its new employees actively to breach their own restrictive covenants with their former employers. However, the evidence actually presented established only one concrete episode. In that case, the Plaintiff allowed Joy Carroll to work for it even though such employment was prohibited by the terms of a restrictive covenant between Carroll and her former employer, Dickson Associates. (Defendant's Exhibit 7). However, before Carroll accepted her employment offer from the Plaintiff, both she and the Plaintiff received independent legal opinions from their respective attorneys that the Dickson Associates restrictive covenant was unenforceable. The Court therefore finds that the Plaintiff did not knowingly encourage other employees to breach their respective restrictive covenants or covenants-not-to-compete with former employers.

Van Steenis testified very frankly that he knowingly violated the terms of his Employment Agreement when he left the Plaintiff, on February 5, 1991, to work for AIM Executive, Inc., a direct competitor of the Plaintiff. (Van Steenis' office at AIM is directly across the street from the Plaintiff's Troy office.) Not only did he immediately occupy the same position with AIM, as recruiter of accounting and finance professionals, as he previously held with the Plaintiff, he took with him certain documents which contained the names, addresses, and appropriate contact persons of his former clients at the Plaintiff. His stated reason for violating the agreement was that, if the Plaintiff could induce Joy Carroll to breach her contract with the Dickson Associates, he felt justified in breaching his similar agreement with the Plaintiff. Besides, he needed to work.

There is no evidence in the record indicating whether Van Steenis' skills are transferable to other jobs not in direct competition with the Plaintiff, or whether he even attempted to find such other jobs. Nor is there any evidence that the Plaintiff would suffer any hardship if he were required to practice his current trade more than 50 miles from the Plaintiff's Michigan offices.

However, the Court does find that the Plaintiff knowingly and voluntarily signed the written Employment Agreement, which contains the following explicit terms:

7. *Disclosure or Misuse of Confidential Information.* Employee shall not, at any time during his or her employment pursuant to this Agreement or thereafter, directly or indirectly, disclose, furnish or make accessible to any person, firm, corporation, or other entity, or make use of, any confidential information obtained while he or she was in the employ of Employer, including, without limitation, information with respect to the name, address, contact persons or requirements of any customer, client, applicant or employee of Employer (whether having to do with temporary or permanent employment) and information with respect to the procedures, advertising, finances, organization, personnel, plans, objectives or strategies of Employer.

Employee acknowledges that such information is safeguarded by Employer as its trade secrets. Upon termination of his or her employment, Employee shall deliver to Employer all copies of all records, manuals, training kits, and other property belonging to Employer or used in connection with Employer's business which may be in Employee's possession.

8. *Restrictive Covenant.* For a period of twelve (12) months after termination of Employee's employment with Employer, Employee agrees that he or she shall not in any part of the area encompassed within a radius of fifty (50) miles from any of Employer's offices directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation or control of, any executive recruiting firm, employment agency or temporary personnel service business, and among other things shall not during this period:

(a) solicit the trade or patronage of any of Employer's customers for himself or herself or for any other person or organization engaging in an executive recruiting firm, employment agency or temporary personnel service business; Employer's customers shall include all persons and organizations for whom Employer performs or has performed services in the course of its business within the three (3) years preceding Employee's termination of employment, regardless of whether or not such customers were previously customers of Employee or of others; or

(b) solicit, induce, or attempt to induce any other employee or Employer to leave Employer's employ to become connected in any way with, or employ any such employee in, any other executive recruiting firm, employment agency or temporary personnel service business.

Employee expressly acknowledges that the restrictive covenants set forth in the previous paragraphs are reasonable and necessary in order to protect and maintain the proprietary and other legitimate

business interests of Employer. Employee further agrees that in the event of an actual or threatened breach by Employee of the provisions of this paragraph, Employer would be irreparably harmed and injury resulting therefrom would be impossible to calculate and Employer therefore will not have an adequate remedy at law. Accordingly, Employee agrees that temporary and permanent injunctive relief would be appropriate remedies against such breach; provided, that nothing herein shall be construed as limiting any other legal or equitable remedies Employer might have. Employee agrees that in the event that he or she is found to have breached this Agreement or to be about to do so, Employee will be liable to Employer for reasonable attorneys' fees and costs incurred in enforcing this Agreement.

(Plaintiff's Exhibit 7, Pars. 7–8, pp. 3–4).

B. Conclusions of Law

■ In Michigan, restrictive covenants and non-competition clauses in employment contracts are enforceable to the extent that their terms are reasonable with respect to duration, geographical area, and the type of employment or line of business. M.C.L. § 445.774a.

The evidence at trial was uncontroverted that Van Steenis knowingly and willingly executed the Employment Agreement containing the restrictions in Paragraphs 7–8, quoted above. Van Steenis himself also admitted during his testimony that he knowingly violated the restrictive covenant contained in Paragraph 8 of the Employment Agreement when he took employment with the Plaintiff's direct competitor, AIM Executive, Inc., within 50 miles of the Plaintiff's Troy, Michigan office (and within 50 miles of the Plaintiff's Southfield, Michigan office) immediately after leaving his employment with the Plaintiff in February, 1991.

Further, the evidence at trial established that the Defendant violated Paragraph 7 of the Employment Agreement by taking with him (and failing to return to the Plaintiff) certain confidential documents he obtained in the course of his employment with the Plaintiff. These confidential documents included 2 years' worth of appointment calendars which contained the names of responsible hiring individuals employed by companies which were the Plaintiff's clients, as well as the names of potential recruits. Van Steenis also took with him his collection of clients' business cards, which contained this same sort of information. This information not only disclosed which officers of variously clients had hiring authority, but also, and perhaps more importantly, which particular firms would be willing to pay for the services of an employment agency such as the Plaintiff and its competitors. Finally, Van Steenis took with him the "pink" copies of the interview notice forms which, again, contained the names of client contacts and the names of potential hires referred to those clients by Van Steenis while employed by the Plaintiff. All of this information was obtained by Van Steenis in the course of his work with the Plaintiff and constitutes valuable information which, if disclosed to a competitor, could materially harm the Plaintiff's business.

The Michigan legislature has specifically enacted that covenants not to compete in employment agreements are not only enforceable, but also *specifically enforceable* by injunction. *See* M.C.L. § 445.774a(1). In addition, the evidence at trial satisfies the Court that the employment recruitment industry in general, and specifically, the recruitment of accountants and finance professionals, is highly competitive, and absent specific enforcement of the restrictive covenants in the Employment Agreement, it will not possible to compensate the Plaintiff in damages in account of the Defendant's breach. This is so, in part, because it will be difficult, if not impossible, to determine whether AIM Executive would otherwise have made certain placements without the benefit of confidential client information obtained by the Defendant from his work with the Plaintiff and improperly imparted by him to AIM. Most of these placements can be filled by any number of competing recruitment firms, such as the Plaintiff and AIM, and any particu-

lar job opening quickly becomes (within six months, at most, according to the evidence at trial) common knowledge within the industry.

For these reasons, the Plaintiff has sought a permanent injunction enforcing the provisions of Paragraphs 7–8 of the Employment Agreement. For these reasons, as well, the Court finds that injunctive relief is appropriate. *Nordson Corp. v. Plasschaert*, 674 F.2d 1371 (11th Cir. 1982) (affirms permanent injunctive relief to enforce the terms of a similar noncompetition agreement); *Economou v. Physicians Weight Loss Centers*, 756 F.Supp. 1024 (N.D.Ohio 1991).

In opposition to the Plaintiff's request for injunctive relief, Van Steenis argues that the Plaintiff's own conduct renders it inequitable to provide the Plaintiff with injunctive relief.

■ First, Van Steenis argues that his signature and consent to the written Employment Agreement was obtained by fraud arising from Fred Getz' allegedly deliberate misrepresentation of the terms of Van Steenis' compensation package. Although the Court has found that Getz did misrepresent the terms of the Plaintiff's compensation, the Court cannot find that such misrepresentations were made deliberately. Further, Van Steenis signed the Employment Agreement on the first day of his employment with the Plaintiff after first reading and understanding the Employment Agreement. As noted, the compensation terms of the Employment Agreement differed materially from those represented orally to Van Steenis by Getz. Yet, Van Steenis signed the agreement anyway, and, as he testified, he would not have signed the Employment Agreement unless he agreed with its terms. Thus, the Court concludes that the Defendant thereby waived any discrepancy between the compensation terms represented by Getz and his actually compensation, which he understood shortly after he started working for the Plaintiff.

In this respect, the Defendant's reliance on *Rood v. Midwest Matrix Mart, Inc.*, 350 Mich. 559, 87 N.W.2d 186 (1957) is mis-placed. As explained by the Michigan Supreme Court in *Dunn v. Goebel Brewing Co.*, 357 Mich. 693, 99 N.W.2d 380 (1959), the *Rood* court merely held that the plaintiff in that case could avoid the terms of his written contract based upon his theory of fraud in the execution; that is, the defendant in *Rood* misrepresented to the him that the proposed written agreement actually incorporated the terms of their agreed oral agreement when, in fact, the written agreement materially varied the terms. The plaintiff in *Rood* signed the written agreement based upon the defendant's false representations without reading it.

In contrast, in the instant case, the Defendant read and understood the written terms of the Employment Agreement before signing it. Thus, the defense of fraud in the inducement is not available to him.

The evidence concerning the Plaintiff's failure to obtain a proper license was, at best, inconclusive. However, it appears that, at all pertinent times, the Plaintiff's Southfield office was appropriately licensed for the type of work that the Defendant performed there. In addition, the Plaintiff's Troy office is presently licensed to perform permanent employment recruitment services. Only the Ann Arbor office remains unlicensed, and the Plaintiff does not perform permanent placement work out of that office in any event. For that reason, the Court will restrict the scope of the injunction to the Southfield and Troy offices only.

■ With respect to the Defendant's argument that the Plaintiff engaged in unconscionable conduct in lowering benefits, increasing his job responsibilities and allowing his fellow recruiters to contact his clients, the Court finds that such conduct appears to be permitted within the written terms of the Employment Agreement which the Defendant knowingly signed the first day he began to work for the Plaintiff. The Court further notes that the Defendant's employment was specifically denominated "at will" by the Employment Agreement.

As to lack of consideration, continued employment constitutes sufficient consideration for the Defendant's execution of the restrictive covenants in the Employment Agreement—where, as here, the Defendant's employment is otherwise "at will." *See Insurance Agents, Inc. v. Abel,* 338 N.W.2d 531 (Iowa.App.1983) (no consideration was found for restrictive covenant because the employee already had a right to employment for at least three years under a previous written contract).

Finally, the Court rejects the Defendant's argument that the Plaintiff's encouraging Joy Carroll to breach the terms of her previous restrictive covenant with Dickson Associates taints the Plaintiff with unclean hands. The uncontradicted evidence at trial showed that both Ms. Carroll and the Plaintiff obtained independent legal opinions that Ms. Carroll's previous restrictive covenant was unenforceable under Michigan law, *before* Ms. Carroll was invited to work for the Plaintiff.

As noted, the Michigan legislature has now determined that the specific enforcement of restrictive covenants in employment agreements is in the public interest. Since, as noted above, money damages will be insufficient to compensate the Plaintiff for the Defendant's acknowledged breach of the restrictive covenant, the Court further finds that it is in the public interest to enforce the restrictive covenants by means of permanent injunctive relief.

However, the Michigan statute, by its terms, allows the enforcement of such agreements only to the extent reasonably necessary to protect the employer's reasonable competitive business interests:

**445.774a. Agreements not to compete; application**

Sec. 4a. (1) An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or

line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

(2) This section shall apply to covenants and agreements which are entered into after March 29, 1985.

M.C.L. § 445.774a.

In the instant case, Van Steenis has committed himself not to compete with, or work for, any business that competes with, the Plaintiff's business anywhere within a 50–mile radius of any of the Plaintiff's offices for a period of one full year after the termination of the Plaintiff's employment with the Defendant. The Plaintiff seeks enforcement of this provision only with respect to a geographical area within 50 miles of the Plaintiff's offices in Ann Arbor, Michigan, Southfield, Michigan, and Troy, Michigan.

The Court finds that it would be unreasonable to restrain Van Steenis from competing within 50 miles of the Plaintiff's Ann Arbor, Michigan office because the Plaintiff concededly does not operate a permanent employment agency from that office, but, rather, uses that office only for the placement of temporary employees through its "Accountemps" business. Since Van Steenis was never involved in that line of the business, nor does it appear that the information gained by him from his employment with the Plaintiff would facilitate his competing with the Plaintiff in that line of business, the Court will deny enforcement of the non-competition agreement with respect to the Ann Arbor portion of the territory.

However, the Plaintiff does conduct a licensed permanent employment agency in both the Southfield and Troy offices. Although the Plaintiff's Troy office was not licensed as a permanent employment agency at the time the Plaintiff signed the Employment Agreement, it became licensed in December, 1990, and the evidence leads the Court to conclude that Van Steenis was

aware, at the time he signed the Employment Agreement, that the Plaintiff did, or intended, to operate a permanent employment agency from the Troy office. Enforcement of the agreement within a 50–mile radius of the Southfield and Troy offices will, therefore, effectively protect the Plaintiff's reasonable competitive business interests.[1]

■ With regard to the one-year term of the agreement, there was some testimony at trial to the effect that the available openings—the potential job openings that potential clients of the Plaintiff might seek to fill through an employment agency—inevitably became well known in the employee-placement industry within six months after the openings were created. However, as the Court perceives it, the purpose of the non-compete clause in Paragraph 8 of the Employment Agreement is not only to preserve actual job openings that existed at the time Van Steenis left his employment with the Plaintiff, but also to protect the proprietary information which Van Steenis learned through his employment with the Plaintiff, including the names of companies that would be willing to pay for the services of employment agencies, and the names and telephone numbers of the responsible hiring persons at those companies. Accordingly, the Court concludes that a one-year period is not unreasonable to protect the Plaintiff's reasonable competitive business interests.

Finally, Van Steenis admitted in his testimony that he violated the terms of Paragraph 7 of the Employment Agreement to the extent that he did not return to the Plaintiff, upon the termination of his employment, certain documents obtained by Van Steenis during his employment with the Plaintiff, which contained the name, contract person, and address of certain of the Plaintiff's clients. Included among these documents are the two years' worth of engagement calendars, clients' business cards, and interview notice forms.

The Court rejects Van Steenis' argument that the Court should not enjoin his use or dissemination of this confidential information on the asserted grounds that the information he obtained during his employment with the Plaintiff does not really constitute "trade secrets" or "confidential information" of the Plaintiff. This information was specifically designated as "confidential information" and "trade secrets" in Paragraph 7 the Employment Agreement. Van Steenis agreed to this designation when he voluntarily accepted and signed the Employment Agreement on May 18, 1988. Accordingly, the Court will permanently enjoin Van Steenis to comply with the terms of Paragraph 7 of the Employment Agreement, both requiring him to return those documents which are in possession immediately to the Plaintiff and prohibiting him from using or disclosing to other persons the confidential information contained in those documents.

ORDER

For the reasons stated herein, and the Court being otherwise fully advised in the premises;

NOW, THEREFORE;

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the Defendant, William Van Steenis is hereby immediately enjoined, *until and including February 5, 1992*, from competing with Plaintiff in the recruitment of accountants and any other professionals in the area of financial management and from directly or indirectly, owning, managing, operating, controlling, being employed by, participating in, or being connected, in any manner, with the ownership, management, operation or control of, any executive recruiting firm or permanent employment agency anywhere within a 50–mile radius of the Plaintiff's Southfield and Troy, Michigan offices, and among other things shall not during this period (from the present through February 5, 1992):

---

**1.** To the extent that there may be overlap between the fifty mile radius areas where Defendant may not compete and areas in which he may compete (e.g., Southfield and Ann Arbor), the Defendant shall not compete in those overlapping areas.

(a) solicit the trade or patronage of any of the Plaintiff's customers for himself or for any other person or organization engaging in an executive recruiting firm, employment agency or temporary personnel service business; "Plaintiff's customers" includes all persons and organizations for whom the Plaintiff performs or has performed services in the course of its business within the three (3) years preceding the Defendant's termination of employment, regardless of whether or not such customers were previously customers of the Defendant or of other persons in the Plaintiff's employ; or

(b) solicit, induce, or attempt to induce any other employee of the Plaintiff to leave its employ to become connected in any way with, or employ any such employee in, any other executive recruiting firm, employment agency or temporary personnel service business.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that the Defendant is hereby enjoined from destroying, transferring, disposing of, or, directly or indirectly, disclosing, furnishing, making accessible to any person, firm, corporation, or other entity, or making use of, any "confidential information" obtained while he was in the Plaintiff's employ. For the purposes of this Order, "confidential information" includes, without limitation, information with respect to the name, address, contact persons or requirements of any customer, client, applicant or employee of the Plaintiff (whether having to do with temporary or permanent employment) and information with respect to the procedures, advertising, finances, organization, personnel, plans, objectives or strategies of the Plaintiff.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED, that the Defendant is hereby enjoined and shall forthwith deliver to the Plaintiff all copies of all records, manuals, training kits, and other property belonging to the Plaintiff or used at any time by the Defendant or any other person in connection with the Plaintiff's

business which may be in the Defendant's possession.