**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

PAWS WITH A CAUSE, INC.,
Plaintiff-Appellee,

v.

DONNA J. CRUMPLER,
Defendant-Appellant,

No. 94-1968

and

ROBO DOGS, INC.; WILLIAM R.
JACKSON; VIRGINIA CANINES FOR
INDEPENDENCE; WILLIAM I. SYDNOR,
Defendants.

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
Richard L. Williams, Senior District Judge.
(CA-93-473)

Argued: November 2, 1995

Decided: January 3, 1996

Before WILKINS, LUTTIG, and WILLIAMS, Circuit Judges.

_____

Affirmed in part and vacated and remanded in part by unpublished
per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Anthony Francis Troy, MAYS & VALENTINE, Rich-
mond, Virginia, for Appellant. H. Lane Kneedler, HAZEL &

THOMAS, Richmond, Virginia, for Appellee. **ON BRIEF:** Andrew G. Mauck, MAYS & VALENTINE, Richmond, Virginia, for Appellant. S. Miles Dumville, John A. Burlingame, HAZEL & THOMAS, Richmond, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

PER CURIAM:

Appellee Paws With A Cause (Paws), a non-profit Michigan corporation, instituted this diversity suit, see 28 U.S.C.A. § 1332(a)(1) (West 1993), against Appellant Donna Crumpler, alleging three claims: (1) breach of a non-competition agreement (NCA); (2) intentional disregard of Paws's rights under the NCA; and (3) conspiracy to injure Paws's business pursuant to Va. Code Ann.§ 18.2-499 (Michie 1988). Paws prayed for damages and an injunction to restrain Crumpler from disclosing or utilizing information that Paws asserted was protected by the NCA. The case was tried to the district court, which issued findings of fact and conclusions of law. See Fed. R. Civ. P. 52(a). The district court concluded that Crumpler breached the NCA, enjoined Crumpler from disclosing or utilizing the information and knowledge protected by the NCA for a term of three years beginning December 20, 1993, and awarded compensatory damages of $18,808. Crumpler appeals. We affirm with respect to liability and granting the injunction, but we vacate and remand with respect to the award of compensatory damages.

I.

This appeal comes to us subsequent to a bench trial. In such a procedural posture, "our scope of review is particularly circumscribed, being limited to determining whether the facts as found by the district court are clearly erroneous." Jiminez v. Mary Washington College, 57

2

F.3d 369, 378 (4th Cir.), cert. denied, 64 U.S.L.W. 3316 (U.S. Oct. 30, 1995) (No. 95-396). We reverse a factual finding as clearly erroneous if, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). The facts as found by the district court, therefore, "are conclusive on appeal . . . unless they are plainly wrong." Jiminez, 57 F.3d at 378-79. The facts recited herein and found by the district court are not clearly erroneous.

Paws trains dogs to aid persons who are hearing impaired or mobility limited or both. Crumpler was an obedience trainer at Robo Dogs, Incorporated (Robo), in Virginia with no formal experience in training, marketing, or placing dogs that helped the handicapped. Desiring to obtain these skills, Crumpler enrolled in a week-long course at Paws's Michigan headquarters in August 1991. At the conclusion of her training, Crumpler returned to Virginia as Regional Director of Paws Virginia.

In connection with her training, Crumpler executed the NCA, which was styled a "Sub-contracting Trainers Agreement" and provided in pertinent part:

> Since [Paws] is a non-profit organization funded largely by United Way of Michigan and by charitable contributions and desires to maintain the availability of the training sessions on a basis satisfactory to its contributors, the terms and conditions under which [Crumpler] receives instruction, knowledge and/or know-how are as follows:
>
> 1. [Paws] agrees to instruct, give knowledge to, and/or know-how to [Crumpler] in the conducting of training sessions directed at dogs and their owners to cause the HEARING DOGS to respond to certain sounds by alerting the owner in various ways to the occurrence of such sounds and SERVICE DOGS to responds [sic] to the needs of the mobility[-]limited community.
>
> 2. In consideration of the above instruction, knowledge and/or know-how, [Crumpler] agrees that he/she will

3

> not communicate such instruction, knowledge and/or know-how to others or make use of it for his/her benefit, for the period of three (3) years from the date of termination of this organization.

(J.A. at 265.) Crumpler knew that she was required to execute the NCA prior to enrolling in Paws's training course.

Eventually, at an unspecified date in early or mid-1992, relations between Paws headquarters and Crumpler soured. As the district court found, Crumpler embarked upon a smear campaign against Paws, stating that she wanted to sever ties with Paws and form her own corporation to train dogs for the handicapped. Consequently, Candye Sapp, Vice President of Paws, wrote Crumpler on November 5, 1992, advising that "[u]ntil all matters can be agreed upon by all parties and all files are up to date and direction taken by this office only, we need you to cease and desist. Once every item is agreed upon and in writing we will go from there." (J.A. at 258.) Based on Sapp's letter, Crumpler considered herself discharged.

The district court found that during Crumpler's tenure as Regional Director of Paws Virginia, Crumpler utilized Robo to train dogs, and if a dog was certified, then Paws would pay Robo for the expenses of training it. Based on this scheme, the district court found "that Crumpler used [Robo] as a tool for enhancing her ability to form and run an organization that could compete with Paws." (J.A. at 178.) The district court also found that Crumpler competed with Paws by forming Virginia Canines for Independence (VCI), an organization virtually identical to Paws, by serving as a director and trainer for VCI. Crumpler and other directors of VCI attempted to conceal VCI's existence because Crumpler and her co-directors were "`pirating' Paws's business." (J.A. at 178.) By competing with Paws, the district court found that:

> Crumpler has violated the [NCA] . . . by utilizing and communicating to others training techniques she learned from PAWS. Crumpler acknowledged . . . that she learned "new" techniques while in Michigan. Also, . . . Crumpler stated that she was "using techniques used by Paws." Crumpler,

4

who admitted that she had never had any formal hearing[-]dog training prior to attending the PAWS training session, has been training hearing dogs. In fact, . . . a dog named Rico was donated to Paws prior to Crumpler's separation from Paws. Subsequently, Crumpler trained Rico as a hearing dog and placed him with a client. Crumpler apparently did so either in her own name or on behalf of VCI, but not as an agent of Paws.

(J.A. at 178-79.) While the district court found that Crumpler violated the NCA, the district court also found that the money-raising and dog-training skills Crumpler learned from Paws were common in the trade.

Applying Michigan law, the district court ruled in favor of Paws with respect to the breach-of-the-NCA claim, held the intentional disregard claim was duplicative of the breach claim, and concluded that Paws failed to establish a conspiracy claim. Accordingly, the district court awarded relief solely on the breach claim. With respect to equitable relief, the district court enjoined Crumpler, VCI, and VCI directors "from using or further communicating `information, knowledge and/or know-how' [Crumpler] gained exclusively through her affiliation with Paws with respect to the training of service and hearing dogs and their owners" for a three-year period commencing December 20, 1993, the date the preliminary injunction issued. (J.A. at 182.) Additionally, Crumpler and directors of VCI were enjoined "from forming any other organization comparable to VCI which would provide hearing or service dogs to persons with disabilities." (J.A. at 183.) Regarding legal relief, the district court awarded $18,808 in compensatory damages based on the comparability of Paws Virginia with Paws operations in New Hampshire and Massachusetts.

In its memorandum opinion on the damages issue, the district court addressed Paws's contention that Crumpler was violating the injunction by operating VCI in direct competition with Paws and by concealing the district court's ruling from VCI directors. The district court rejected Paws's contention, explaining that Crumpler and her directors were enjoined merely from using or further communicating the information and knowledge Crumpler learned from Paws and that Crumpler was enjoined from forming another organization similar to

5

Paws, but that Crumpler was not enjoined from operating VCI. The district court found, however, that Crumpler and some directors of VCI deliberately trivialized to other directors of VCI the nature and extent of the relief granted to Paws. Accordingly, the district court ordered counsel for Crumpler to notify Robo and VCI directors of the existence and nature of the injunction.

II.

A federal court exercising its diversity jurisdiction, as here, must apply the substantive law of the forum state, see Erie R.R. v. Tompkins, 304 U.S. 64, 78 (1938), and because application of choice-of-law rules is a substantive matter, see Klaxon Co. v. Stentor Elec. Mfg., 313 U.S. 487, 496 (1941), Virginia's choice-of-law rule applies. Under Virginia law, because the NCA was entered into in Michigan and does not provide a choice-of-law provision, Michigan substantive law controls the validity, interpretation, and construction of the NCA. See Woodson v. Celina Mut. Ins. Co., 177 S.E.2d 610, 613 (Va. 1970). Although Michigan substantive law applies to liability, under Virginia's choice-of-law rules, Virginia law governs procedure and remedy. See Jones v. R.S. Jones & Assocs., 431 S.E.2d 33, 34 (Va. 1993). We therefore apply Michigan law to resolve the enforceability of the NCA.

Michigan law provides in pertinent part:

> Agreements not to compete; application
>
> An employer may obtain from an employee an agreement or covenant which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement or covenant is reasonable as to its duration, geographical area, and the type of employment or line of business. To the extent any such agreement or covenant is found to be unreasonable in any respect, a court may limit the agreement to render it reasonable in light of the circumstances in which it was made and specifically enforce the agreement as limited.

6

Mich. Comp. Laws Ann. § 445.774a(1) (West 1995). Michigan law, therefore, explicitly provides for non-competition agreements and provides that the court, sua sponte, may amend an unreasonable agreement so as to render it reasonable under the circumstances in which it was made. See Superior Consulting Co. v. Walling, 851 F. Supp. 839, 847 (E.D. Mich. 1994) (modifying a former employee's non-competition agreement pursuant to section 445.774a(1) to render it reasonable as to type of work), appeal dismissed and remanded on other grounds, 48 F.3d 1219 (6th Cir. 1995) (per curiam) (unpublished); Robert Half Int'l, Inc. v. Van Steenis, 784 F. Supp. 1263, 1273-74 (E.D. Mich. 1991) (amending a former employee's non-competition agreement under section 445.774a(1) to render it reasonable as to geographic scope). In determining whether to sustain a non-competition agreement pursuant to section 445.774a(1), we must focus our inquiry on the reasonableness of the restriction, remaining cognizant of the fact that non-competition agreements that restrict employment opportunities are to be narrowly tailored. See Superior Consulting Co., 851 F. Supp. at 847.

Crumpler challenges the enforceability of the NCA, advancing three arguments. First, she asserts that section 445.774a(1) only applies to trade secrets or confidential information and that because the knowledge and skills she acquired from Paws were commonly known in the trade, section 445.774a(1) does not apply. According to Crumpler, the NCA protects no legitimate business interest in trade secrets or confidential information. Second, she contends that the NCA is characterized properly as a non-disclosure agreement, not a non-competition agreement, and because the statute only applies to non-competition agreements, it does not apply here. Third, she posits that the NCA is not enforceable because it is of potentially unlimited duration. Conversely, Paws maintains that the statute is not restricted to trade secrets and confidential information. In addition, Paws argues that the NCA prohibits both disclosure as well as unfair competition and thus the statute applies to this suit. We address these contentions seriatim.

A.

Crumpler first contends that the statute is not enforceable as applied here because its application serves no reasonable competitive

7

business interests in that the knowledge and skills she learned from Paws were not unique to Paws but commonly known in the trade. To advance this contention, Crumpler relies principally on Follmer, Rudzewicz & Co. v. Kosco, 362 N.W.2d 676 (Mich. 1984). In Kosco, the Supreme Court of Michigan observed that while restrictive non-competition agreements can be sustained under certain circumstances, generally they are limited to protecting trade secrets or confidential information or both. See id. at 680-83. Crumpler's reliance on Kosco is misplaced because Kosco predated section 445.774a(1) and thus does not reflect the conscious legislative amendment that approved non-competition agreements, which previously had been viewed generally as void under Michigan common law as contrary to public policy, see Compton v. Joseph Lepak, DDS, P.C., 397 N.W.2d 311, 313-14 (Mich. Ct. App. 1986). Subsequently, non-competition agreements were enforced provided they were reasonable. See id. at 314-15 (tracing history of Michigan law respecting non-competition agreements). Hence, while Crumpler's contention that non-competition agreements do not apply to common knowledge has support in prior Michigan law, the dramatic change in Michigan law made by section 445.774a(1) precludes us from simply relying on Kosco.

Rather, we must examine the statutory language of section 445.774a(1) to determine its applicability to agreements not to utilize information commonly known in the trade. In analyzing a statute, our first consideration is the statutory language. See United States v. Murphy, 35 F.3d 143, 145 (4th Cir. 1994), cert. denied, 115 S. Ct. 954 (1995). Absent allowable gap-filling as provided in the statute, we are not at liberty "to read into the language what is not there, but rather [we] should apply the statute as written." Id. Provided the statutory language is unambiguous, properly enacted, and does not lead to an absurd result, the canons of interpretation do not arise, and the duty of the court is to enforce the statute as written. See id.

Applying Murphy, we cannot subscribe to Crumpler's first contention because by its plain terms, section 445.774a(1) is not confined exclusively to trade secrets or confidential information. Rather, the statute permits the use of non-competition agreements, the sole restriction being that such agreements must be reasonable. Crumpler's cramped interpretation is contrary to the language of the statute. Section 445.774a(1) has simply not been given a confined interpretation.

8

See Superior Consulting Co., 851 F. Supp. at 847 (observing that a world-wide geographic restriction on competition is reasonable if the employer has a world-wide market). Contrary to Murphy, Crumpler would have us gloss section 445.774a(1) with words that are not in the statute. Accordingly, we reject Crumpler's contention that section 445.774a(1) is limited to trade secrets or confidential information or both.

B.

Crumpler's second contention is that the NCA is unenforceable because it is a non-disclosure agreement, not a non-competition agreement, and the statute applies only to non-competition agreements. A plain reading of the NCA, principles of Michigan contract law, and section 445.774a(1) compel us to reject this argument.

Under Michigan law, "[c]ontractual language is to be given its ordinary and plain meaning." Fitch v. State Farm Fire & Casualty Co., 536 N.W.2d 273, 275 (Mich. Ct. App. 1995). The paramount consideration in construing ambiguous contracts is to ascertain the parties' intent. See Kassin v. Arc-Mation, Inc. , 288 N.W.2d 413, 415 (Mich. Ct. App. 1979). Although Michigan common law generally precludes a court from inserting into or omitting terms from a written contract absent fraud or mistake, see Gary Boat Club, Inc. v. Oselka, 188 N.W.2d 127, 130 (Mich. Ct. App. 1971), section 445.774a(1) provides expressly that a court may construe a non-competition agreement to render it reasonable, and Michigan courts have recognized that gap-filling measures in contracts are permissible, see Rowe v. Montgomery Ward & Co., 473 N.W.2d 268, 285 (Mich. 1991) (Boyle, J., concurring).

Here, Crumpler is correct that the NCA prevents disclosure of knowledge and skills garnered from Paws. The NCA also unequivocally provides that Crumpler is precluded from "mak[ing] use of [knowledge and/or know-how] for [her] benefit." The language of the NCA is not confined to limiting disclosure, but rather extends to limit competition and bars Crumpler from competing with Paws. We therefore decline Crumpler's invitation to read out the non-competition provisions of the NCA.

9

The circumstances surrounding execution of the NCA bolster our conclusion that the NCA is a non-competition agreement. For instance, Crumpler solicited Paws, enrolled in Paws's training class, received training, and undertook this course of action knowing that she would be required to sign the NCA. Moreover, she executed the NCA while in Michigan and returned to Virginia to be Regional Director of Paws Virginia; her name appears on the official Paws letterhead as the Regional Director of Paws Virginia. Like the district court, we are persuaded that Crumpler knew that the import of the NCA was to prevent her from competing unfairly with Paws; the tenor of the NCA is one of non-competition, not merely of non-disclosure. Section 445.774a(1) provides that an employer may obtain a non-competition agreement that protects his competitive business interest, and the language in the NCA does just that. We conclude, therefore, that the NCA is indeed a non-competition agreement and is not limited to precluding disclosure.

C.

1.

Crumpler's final argument respecting enforceability is that the NCA is void because it is of potentially unlimited duration. In its recitals, the NCA provides that Paws "is a non-profit organization funded largely by United Way of Michigan . . . ." (J.A. at 265.) In the substantive clauses articulating Crumpler's obligations as Regional Director of Paws Virginia, the NCA provides that Crumpler may not compete unfairly with Paws "for the period of three (3) years from the date of termination of this organization." Id. According to Crumpler, because the use of the term "organization" in the recitals refers to Paws's Michigan headquarters, the term "organization" in the substantive, non-competition clauses of the NCA must also refer to Paws's Michigan headquarters. Because Paws is a corporation, and corporations have potentially unlimited duration, see generally Harry G. Henn & John R. Alexander, Laws of Corporations § 75, at 132 (3d ed. 1983), she argues that the "date of termination of this organization" may never occur. Thus, Crumpler contends that because section 445.774a(1) provides that non-competition agreements must have a reasonable duration, the NCA is void because a potentially perpetual

10

duration is not a reasonable limit. We cannot subscribe to this argument.

The district court found as a fact that the term "organization" in the non-competition clause referred to Paws Virginia. As the trier of fact, the district court must resolve ambiguity in the term "organization." See Zinchook v. Turkewycz, 340 N.W.2d 844, 848 (Mich. Ct. App. 1983) (stating that in cases of ambiguity, incomplete language, or "unusual circumstances," the trier of fact resolves the meaning of the parties' contract). Because the district court's factual finding regarding the parties' meaning of the term "organization" is not clearly erroneous, it is conclusive upon the reviewing court. See Jiminez, 57 F.3d at 378-79 (stating that unless the factual findings of the district court are clearly erroneous, they must be sustained on appeal and explaining that even if the appellate court concludes that another interpretation of the facts may be "better," it is still bound by the factual findings of the district court provided they are not plainly wrong). The term "organization" therefore refers to Paws Virginia.

2.

Having determined that the term "organization" refers to Paws Virginia, we must now determine the duration of the NCA. We commence with the premise that Michigan "[c]ourts will not interpret a contract in a manner which would impose an absurd or impossible condition on one of the parties." Wembelton Dev. Co. v. Travelers Ins. Co., 206 N.W.2d 222, 225 (Mich. Ct. App. 1973). Under Michigan law, therefore, a "contract will not be adjudicated to be illegal when it is capable of a construction which will [up]hold it and make it valid." Stillman v. Goldfarb, 431 N.W.2d 247, 251-52 (Mich. Ct. App. 1988). Michigan courts construe a contract to effectuate the parties' intent. See Kassin, 288 N.W.2d at 415. Specifically with respect to the duration of non-competition agreements, the Michigan courts have recognized "that covenants not to compete will not be stricken simply because they are unlimited in time. Instead they are enforced during a period deemed reasonable." Compton , 397 N.W.2d at 314. Indeed, section 445.774a(1) by its express terms provides that if a restrictive agreement is unreasonable, a court, on its own accord, "may limit the agreement to render it reasonable . . . and specifically enforce the agreement as limited."

11

Applying these precepts, we conclude that the district court properly determined that the NCA has a three-year duration. We affirm the district court's finding that the NCA limits the applicability of its restrictions to three years, and thus the parties would not have contemplated potentially perpetual application. Second, while federal courts applying section 445.774a(1) have sustained injunctions with durations of six months, see Superior Consulting Co., 851 F. Supp. at 847, and one year, see Van Steenis, 784 F. Supp. at 1274, we do not believe that a Michigan court would hold that an injunction with a three-year duration is unreasonable, see Jamens v. Township of Avon, 246 N.W.2d 410, 413 (Mich. Ct. App. 1976) (sustaining a three-year injunction), and other courts have likewise permitted three-year durations, see, e.g., Curtis 1000, Inc. v. Youngblade, 878 F. Supp. 1224, 1262 (N.D. Iowa 1995) (noting that covenants not to compete with a duration of two to three years generally are sustained under Iowa law); McMurray v. Bateman, 144 S.E.2d 345, 356 (Ga. 1965) (sustaining a three-year injunction against competition under Georgia law); see also Superior Gearbox Co. v. Edwards, 869 S.W.2d 239, 248 (Mo. Ct. App. 1993) (concluding that a five-year injunction prohibiting competition is valid under Missouri law). We hold, therefore, that the district court did not err in determining that the duration of the injunction is three years and that this duration is reasonable.

III.

Crumpler asserts alternatively that if we sustain the injunction, the district court erred in setting the commencement of the three-year period at December 20, 1993, the date the preliminary injunction was entered. According to Crumpler, this results in Paws actually receiving a four-year injunction, given the delay of litigation. Crumpler maintains that the injunction should expire on November 10, 1995, three years from the date that Paws knew Crumpler was violating the NCA. Although Crumpler contends that Michigan law applies to this issue, under Virginia's choice-of-law rules, Virginia law governs procedure and remedy. See Jones, 431 S.E.2d at 34 (stating that Virginia's choice-of-law rules provide that the court is to apply the substantive law of the forum where the contract was entered, but that Virginia law applies to matters of procedure and remedy). The decision to grant an injunction rests with the sound discretion of the district court and will not be reversed absent an abuse of discretion. See

12

Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 814 (4th Cir. 1991). In applying this standard, we review the factual findings for plain error, while the legal conclusions are reviewed de novo. See North Carolina v. City of Virginia Beach, 951 F.2d 596, 601 (4th Cir. 1991).

We cannot conclude that the district court abused its discretion in fixing the commencement date from the date of entry of the preliminary injunction on December 20, 1993, even if this results in the injunction remaining in effect longer than three years. See Roanoke Eng'g Sales Co. v. Rosenbaum, 290 S.E.2d 882, 887 (Va. 1982) (explaining that an injunction issued in connection with a non-competition agreement properly commenced on the date of entry of final judgment in litigation resolving the suit rather than the date provided for in the non-competition agreement); see also Premier Indus. Corp. v. Texas Indus. Fastener Co., 450 F.2d 444, 448 (5th Cir. 1971) (noting that the district court properly sustained an injunction with respect to a non-competition agreement beyond the duration provided for in the agreement); Home Gas Corp. of Mass. v. DeBlois Oil Co., 691 F. Supp. 567, 578 (D.R.I. 1987) (extending an injunction so that it commenced on the date of entry of judgment). The commencement date is therefore affirmed.

IV.

Finally, Crumpler raises three challenges to the damages award. First, she contends that she owed no duty of loyalty to Paws and hence is not liable for damages. Second, she argues that Paws is not entitled to any legal relief because it was awarded equitable relief on the claim on which it prevailed. Third, Crumpler asserts alternatively that if compensatory damages are appropriate, the award cannot be sustained because there is insufficient evidence to support it. We address these challenges in turn.

A.

Crumpler's first contention is that the district court awarded damages based on a breach of a duty of loyalty, but she owed no duty of loyalty to Paws. This contention is belied by the district court's order, which states that damages were awarded based on breach of the NCA:

13

"The Court has found that Crumpler . . . has violated the Agreement she signed with Paws by utilizing and communicating to others training techniques she learned from Paws." (J.A. at 217.) Similarly, the district court found that Crumpler "`pirat[ed]' Paws's business" by utilizing Paws's training techniques to compete unfairly with Paws. (J.A. at 178.) We disagree, therefore, that compensatory damages were awarded pursuant to the tort of breach of a duty of loyalty; rather, compensatory damages were awarded for breach of contract.

B.

Crumpler's second challenge to the compensatory damages award is that, assuming the injunction is sustained, a compensatory damages award would constitute a duplicative recovery because the only claim upon which Paws prevailed was the breach claim, which was remedied by the district court's entry of an injunction. Relying on Eberts v. Businesspeople Personnel Services, 620 S.W.2d 861 (Tex. Civ. App. 1981, no writ history), and Brannon v. Auto Center Manufacturing Co., 393 So. 2d 75 (Fla. Dist. Ct. App. 1981), Crumpler posits that a court cannot award equitable and legal relief for the same harm. Crumpler misreads Eberts and Brannon. The Eberts court stated that applying liquidated damages and an injunction to the same time period was improper and that "if actual damages are proved, plaintiff may be entitled to damages for a breach that occurred before the suit was filed as well as to an injunction restraining subsequent breaches." Eberts, 620 S.W.2d at 864. Similarly in Brannon, the court explained that awarding both compensatory damages and an injunction is not improper, provided that the breaching party does not have an injunction enforced against it as well as have compensatory damages assessed against it for the entire term of the injunction. See Brannon, 393 So. 2d at 77. Thus, an injunction and compensatory damages for breach of a non-competition agreement are proper remedies, provided that the compensatory damages and the injunction do not apply to the same time period. See, e.g., Presto-X-Co. v. Ewing, 442 N.W.2d 85, 90 (Iowa 1989); Frank D. Wayne Assocs. v. Lussier, 454 N.E.2d 109, 112 (Mass. App. Ct.), review denied, 456 N.E.2d 469 (Mass. 1983). Here, the damages were for a one-year period covering 1992-1993, while the injunction commenced on December 20, 1993, and endures until December 20, 1996: the injunction provides for prospective

14

relief, while the damages provide for the injury already incurred. Thus, the award of compensatory damages is not duplicative.

C.

Crumpler's final contention respecting damages for lost profits is that the evidence was insufficient to support the verdict. According to Crumpler, the methodology employed for computing damages is speculative because Paws failed to prove its projected expenses for 1993.

Under Virginia law, compensatory "damages are recoverable for loss of profits prevented by a breach of contract`only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty.'" See Techdyn Sys. Corp. v. Whittaker Corp., 427 S.E.2d 334, 339 (Va. 1993) (quoting Boggs v. Duncan, 121 S.E.2d 359, 363 (Va. 1961)). If the damages are "speculative, remote, uncertain, or contingent," then they are not recoverable. Id. While the district court's calculation of damages will be sustained unless it is clearly erroneous, the district court is obligated to explain the rationale for its decision so that an appellate court meaningfully may review the award. See Little Beaver Enters. v. Humpreys Rys., 719 F.2d 75, 79-80 (4th Cir. 1983).

The district court awarded Paws $18,808 in lost profits. This award represents the average of Paws's profits in New Hampshire and Massachusetts for 1993, subtracting the amount of money Paws Virginia earned for the same time period, and deducting five percent for expenses. The district court made these calculations by comparing Paws Virginia to the Paws operations in New Hampshire and Massachusetts: (1) all three organizations commenced operations at approximately the same time; (2) the profits for Paws New Hampshire and Paws Massachusetts were consistent with the national growth of the organization for the four years prior to trial; and (3) the level of competency of the trainers and regional directors was comparable in the three states.

Crumpler objects to this method of calculation, contending that the Paws operations in New Hampshire and Massachusetts are not comparable to Paws Virginia. We are unable to determine the comparabil-

15

ity of the various Paws organizations based on the record before us. First, there is no evidence that the fund-raising activities were the same in Paws's Virginia, New Hampshire, and Massachusetts operations, despite the fact that the evidence revealed unequivocally that the local nature of fund-raising is very germane to profits. Second, while Crumpler worked full-time, she was the sole worker at Paws Virginia, while Paws operations in Massachusetts had three part-time employees. Despite this discrepancy in the number of employees, the district court did not determine whether Crumpler's hours were comparable to the total number of hours worked by the employees in Massachusetts. Third, the relevant market was not established, and indeed, at first blush, Virginia is not geographically comparable to New Hampshire or Massachusetts. Thus, we are not persuaded that comparability was established. See, e.g., Metrix Warehouse v. Daimler-Benz Aktiengesellschaft, 828 F.2d 1033, 1044 n.21 (4th Cir. 1987) (approving use of comparability method for calculating damages in antitrust case, but explaining that there must be reasonable comparability between the business and markets in question), cert. denied, 486 U.S. 1017 (1988).

Also, while the district court deducted five percent for expenses, there is no explanation of how the district court arrived at this figure, and Virginia courts repeatedly have disapproved of damages for lost profits if expenses are not proved and deducted, see, e.g., ADC Fairways Corp. v. Johnmark Constr., 343 S.E.2d 90, 93 (Va. 1986) (reversing lost profits award because there was no proof of expenses and the damages award was predicated on an estimated profit margin, not a proved profit margin); Boggs, 121 S.E.2d at 363-64 (reversing damages award because expenses were not taken into consideration). As we explained in Little Beaver Enters.,"the trial court, as a threshold requirement, must expose `the measure of damages and method of computation,' both to inform the litigants of the basis for its findings and to afford the appellate court `a possibility of intelligent review.'" Little Beaver Enters., 719 F.2d at 79-80 (quoting Safer v. Perper, 569 F.2d 87, 100 (D.C. Cir. 1977)). We are not persuaded the district court satisfied the obligations of Little Beaver Enters. We vacate the award of compensatory damages and remand to the district court to explain adequately the compensatory damages award and to ensure that comparability was established.

16

V.

We affirm the district court's conclusions with respect to liability. Likewise, we affirm the district court's granting an injunction and fixing its commencement date at December 20, 1993. We conclude, however, that the rationale supporting the damages award was not sufficiently explained; therefore, we vacate the damages and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART; VACATED AND REMANDED IN PART

17